LEWIS, J.,
dissenting.
I cannot join the erroneous decision of the majority, which authorizes a misleading and deceptive ballot title and summary to be placed before Florida voters on a future election ballot. In Florida Department of State v. Slough, 992 So.2d 142, 149 (Fla.2008), this Court noted that “[i]n recent years, advantageous but misleading ‘wordsmithing’ has been employed in the crafting of ballot titles and summaries. Sponsors attempt to use phrases and wording techniques in an attempt to persuade voters to vote in favor of the proposal.” This misleading and deceptive ballot title and summary perpetuates the unfortunate trend of creative “wordsmithing” rather than adhering to the requirements of the law. A ballot title and summary can neither “fly under false colors” nor “hide the ball” with regard to the true effect of an amendment, Armstrong v. Harris, 773 So.2d 7, 16 (Fla.2000); however, the ballot title and summary here do both by making empty promises and failing to advise voters of critical aspects of the proposal.

Creation of a “Right"

The deception commences with a misleading ballot title: “Florida Growth Management Initiative Giving Citizens the Right to Decide Local Growth Manage *128 ment Plan Changes.” (Emphasis supplied.) A “right” is defined as “[a] power, privilege, or immunity secured to a person by law.” Black’s Law Dictionary 1347 (8th ed.2004) (emphasis supplied). The use of this word in the title clearly implies that if voters approve this amendment, they will have a right to vote on any proposed local-growth-management changes. However, one need look no further than the actual text of the proposal to reveal the deceptiveness of this title, for the text announces that the amendment only allows for “a limited opportunity for voters to approve or disapprove these plans or amendments.” (Emphasis supplied.) Hence, even the sponsors recognized that the instant amendment does not create a right, but only a very limited opportunity which is contingent upon the occurrence of multiple preconditions. Such a false promise is patently misleading.
This Court has previously stricken amendments from the ballot where the titles and summaries have purported to promote greater rights or impose additional restrictions on government, but have in fact actually limited existing rights or relaxed existing restrictions. In Armstrong, this Court held that a ballot title, which read “United States Supreme Court Interpretation of Cruel and Unusual Punishment” and a summary, which provided that the proposed amendment “[r]equires construction of the prohibition against cruel and/or unusual punishment to conform to United States Supreme Court interpretation of the Eighth Amendment,” were affirmatively misleading. See 773 So.2d at 16-17. This Court explained that although the title offered the impression that “the amendment will promote the rights of Florida citizens through the rulings of the United States Supreme Court,” the amendment actually restricted the rights of Floridians because the United States Constitution ban against cruel and unusual punishment provided fewer protections than the Florida Constitution ban on cruel or unusual punishment. See id. at 17. This Court ultimately concluded that the amendment “flew under false colors” because “a citizen could well have voted in favor of the proposed amendment thinking that he or she was protecting state constitutional rights when in fact the citizen was doing the exact opposite — i.e., he or she was voting to nullify those rights.” Id. at 18.
In Askew v. Firestone, 421 So.2d 151, 153, 156 (Fla.1982), this Court struck a proposed amendment from the ballot with a title, “Financial Disclosure Required Before Lobbying by Former Legislature and Statewide Elective Officers,” and a summary which provided that the proposed amendment would impose financial-disclosure restrictions on former legislators and elected officials who sought to lobby before any state government body. This Court concluded that the proposed amendment “flew under false colors” because the summary failed to note that the amendment would actually abolish an existing two-year complete ban on such lobbying activities:
Although the summary indicates that the amendment is a restriction on one’s lobbying activities, the amendment actually gives incumbent office holders, upon filing a financial disclosure statement, a right to immediately commence lobbying before their former agencies which is presently precluded. The problem, therefore, lies not with what the summary says, but, rather, with what it does not say.
[[Image here]]
If the legislature feels that the present prohibition against appearing before one’s former colleagues is wrong, it is *129 appropriate for that body to pass a joint resolution and to ask the citizens to modify that prohibition. But such a change must stand on its own merits and not be disguised as something else.
Id. at 155-56 (emphasis supplied) (footnote omitted).
In the instant case, the title of the proposed amendment similarly “flies under false colors” with its false promise that it creates a “right.” The misleading nature of this title is further compounded by the fact that significant prerequisites and extreme limitations to referenda under the proposal render this purported “right” almost completely illusory.

Prerequisites and Limitations to Referenda

The ballot summary is also misleading because it completely fails to mention the onerous preconditions that must be satisfied before a voter can make any attempt to obtain a referendum on a local-growth land-management plan change. Although the summary notes that ten percent of county or city voters must sign a Florida Growth Management Initiative Petition to obtain a referendum, the summary does not mention that the amendment requires a registered voter who desires a referendum to not merely sign and petition for relief, but to travel to his or her local elections office to sign the petition only in that location. Thus, under the amendment, individuals who seek a referendum may not set up a public kiosk at a local library, market, or government building where voters may sign the petition, as is the customary and traditional method of citizen involvement. Thus, a means that is commonly employed to obtain signatures for placement of an initiative amendment on the ballot — such as the amendment filed by the sponsor in this case — is not available under this proposal.
Although an elections office may be accessible to many citizens, this is clearly not the case for all. For example, a Florida voter living in a distant corner of a Florida county may be forced to travel hundreds of miles roundtrip to sign a petition that is housed at the County Supervisor of Elections Office located in a distant location. For a retired senior citizen who is living on a fixed income, or a citizen barely meeting expenses and feeding his or her family, an attempt to invoke this purported “right” to a referendum would consume both significant time and money — money that may not be available in these economically stressed times — as to be a practical impossibility. The ballot title and summary mention nothing of this onerous requirement and, in my opinion, clearly “hide the ball” with regard to a very significant and most uncommon aspect of the proposed amendment.
A second limitation on the exercise of this so-called “right” to vote on growth-management plans that is omitted from the summary is the time limitation within which the required signatures must be acquired. Under the amendment, a referendum petition must be submitted to the County Supervisor of Elections or the City Clerk within sixty days from the date of the first signature on the petition. This sixty-day deadline is fixed regardless of the size of a city or county. Hence, under this proposed amendment, for there to ever be a referendum in Broward County on a growth-management plan, more than 103,000 registered voters[3] would need to travel to the Broward County elections *130 office during a period of two months to sign a petition. Even if those offices were open seven days a week (which I assume they are not), an average of at least 1,717 signatures would need to be obtained per day for the required number of signatures to be collected within the sixty-day time-frame — a clearly unrealistic feat. The ballot summary in this case “hides the ball” because it fails to describe that such a restriction, which is mandated by the amendment, will render it virtually impossible for the “right” to vote on a land growth management plan to come to fruition. See generally Advisory Opinion to Attorney Gen. re Stop Early Release of Prisoners, 642 So.2d 724, 726-27 (Fla.1994) (ballot summary that stated the proposed amendment “ensures” inmates would serve at least eighty-five percent of their sentences was “inaccurate and seriously misleading” for the failure to mention the pardon and clemency powers of the Governor and the Cabinet; Court concluded that the summary would “mislead[] voters into believing that the amendment is ironclad, when in fact it expressly leaves the Governor and Cabinet an easy, cheap, and relatively painless method of defeating the entire purpose stated in the summary” (emphasis supplied)).

Preemption

Finally, the ballot title and summary are deceptive because they fail to inform the voters of a chief purpose of the proposed amendment: preemption of all other land-use proposals, including one, the wording for which has already been approved by this Court, that actually creates the right for a citizen vote that the ballot title here falsely promises. In 2006, we approved the wording for placement on the ballot of a proposed amendment that would require local governments to submit to a vote any new comprehensive land-use plan, or an amendment to an existing comprehensive land-use plan, prior to adoption. See Advisory Opinion to Attorney Gen. re Referenda Required for Adoption & Amendment of Local Gov’t Comprehensive Land Use Plans, 938 So.2d 501, 501-02, 506 (Fla.2006) (Land Use Plans). The text of that proposed constitutional amendment expressly guarantees a right to voter approval with regard to land-use-plan changes:
Public participation in local government comprehensive land use planning benefits the conservation and protection of Florida’s natural resources and scenic beauty, and the long-term quality of life of Floridians. Therefore, before a local government may adopt a new comprehensive land use plan, or amend a comprehensive land use plan, such proposed plan or plan amendment shall be subject to vote of the electors of the local government by referendum, following preparation by the local planning agency, consideration by the governing body as provided by general law, and notice thereof in a local newspaper of general circulation. Notice and referendum will be as provided by general law. This amendment shall become effective immediately upon approval by the electors of Florida.
Id. at 502 (emphasis supplied).
The proposal in the instant case notes under the “Statement and Purpose” section that one purpose of the amendment is to “pre-empt or supersede recent proposals to subject all comprehensive land use plans and amendments to votes.” Despite this express language, the ballot title and summary for this proposed amendment is completely silent with regard to the fact that one of the chief purposes of this amendment is to vitiate or overrule the effects of the proposed amendment in Land Use Plans. Rather than highlight *131 this significant effect of the proposal, the ballot title instead deceptively proclaims that the instant amendment creates a “right.” I conclude that the wording techniques here have produced a title and summary that misleads by omission, and therefore “hides the ball.” See Advisory Opinion to Attorney Gen. re Term Limits Pledge, 718 So.2d 798, 803 (Fla.1998) (“A ballot summary may be defective if it omits material facts necessary to make the summary not misleading.” (quoting Advisory Opinion to Attorney Gen. — Limited Political Terms in Certain Elective Offices, 592 So.2d 225, 228 (Fla.1991))); see also Armstrong, 773 So.2d at 18 (ballot summary was misleading and “hid the ball” where it failed to state the primary effect of the amendment; i.e., to change the Cruel or Unusual Clause of the Florida Constitution to prohibit cruel and unusual punishment).
Like the misleading ballot title and summary that were stricken in Askew, the problem here “lies not with what the summary says, but, rather, with what it does not say.” 421 So.2d at 156; see also Term Limits Pledge, 718 So.2d at 804 (“When the summary of a proposed amendment does not accurately describe the scope of the text of the amendment, it fails in its purpose and must be stricken.” (emphasis supplied)). I cannot agree with the majority that a ballot summary that fails to disclose multiple prerequisites to exercising a purported “right” and is silent with regard to the fact that the proposed amendment has the potential to destroy rights that would be created by a separate constitutional amendment does not “hide the ball” and is not misleading. Instead, voters must know about these prerequisites and the purpose behind this proposal to be able to make an informed decision in the voting booth. I simply cannot join an opinion which not only allows but, by approval, encourages deception upon the Florida voters.
Indeed, fair notice could be provided to voters by minor edits to the ballot title and summary — without exceeding the statutory word limits. For example, the following revisions produce a ballot title and summary that is accurate with regard to the proposed amendment:
Florida Growth Management Initiative Giving Citizens -the — Right Creating Limited Opportunity to Decide Vote on Local Growth Management Plan Changes
Allows Floridians to-ea-li-for voter approval ofa limited opportunity to vote on changes to local growth management plans through a citizen petition. Voter approval of growth management plan changes will be required if 10% of the voters in the city or county sign within sixty days at the local election office a petition calling for such a referendum. Defines terms and establishes petition requirements. Preempts all other land use proposals.
As revised, this title and summary provide the clarity and accuracy that section 101.161(1), Florida Statutes, requires— which the current title and summary lack.
I do not address the wisdom of a proposed constitutional amendment that addresses voter approval of land-use changes or the conditions placed upon a referendum with regard to strict time and location requirements. However, as a member of this Court, I have a duty to ensure that the ballot title and summary to a proposed amendment are fair and accurate and that voters are fairly informed. See generally Advisory Opinion to the Attorney Gen. re Tax Limitation, 644 So.2d 486, 490 (Fla.1994) (noting that it is this Court’s responsibility to ensure the clarity of ballot titles and summaries in accordance with section 101.161(1), Florida Statutes); Armstrong, 773 So.2d at 13-14 (the accuracy of the title and summary is “of paramount impor *132 tance” because the text of the constitutional amendment will not be present in the voting booth). The merit of the substance of the proposed amendment is not within our responsibility — truthful disclosure to our citizen voters is our highest obligation.
Here, the intent of the amendment is to preempt another proposal that creates the right to a referendum for any changes to a land-use plan. The ballot title and summary should state this plain truth; instead, the title falsely touts the creation of a “right.” Creative wordsmithing that cloaks the true purpose of this amendment — an amendment that actually limits the voice of Florida voters with regard to growth-management-plan changes — in an attempt to ensure passage is contrary to the basic tenet of our democracy that voters receive fair notice of proposed constitutional changes. See Armstrong, 773 So.2d at 13 (“All that the Constitution requires or that the law compels or ought to compel is that the voter have notice of that which he must decide .... What the law requires is that the ballot be fair and advise the voter sufficiently to enable him intelligently to cast his ballot.”) (quoting Askew, 421 So.2d at 154-55). As this Court recently noted, “[t]he voters of Florida deserve nothing less than clarity when faced with the decision of whether to amend our state constitution, for it is the foundational document that embodies the fundamental principles through which organized government functions.” Slough, 992 So.2d at 149.
I regret that the majority has failed Florida’s voters by approving this patently misleading amendment for placement on a future election ballot. Therefore, I dissent.
PARIENTE, J., concurs.

. The website for the Broward County Supervisor of Elections states that there are 1,030,-632 registered voters in Broward County. See Broward County Supervisor of Elections, Voter Registration Statistics Summary, http:// www.browardsoe.org/VRStats.aspx? Summaries=l (last visited December 16, 2008).